Downey, Judge,
delivered the opinion of the court:
The plaintiff was, during the period here involved and still is, an inspector of customs at the port of New York. After considerable service in minor capacities, in all of which his appointment followed a proper civil-service examination, he was on April 16, 1910, after a promotion examination, appointed inspector, class 2, new office, with compensation at the rate of $4 per diem, and was paid at that rate until his promotion to inspector, $5 per diem, on October 10, 1919. By his original petition filed April 13, 1916, plaintiff demanded judgment for additional compensation as an inspector of customs at the port of New York at the rate of $1 per day from April 16, 1910, to and including June 30,1910, 76 days, amounting to $76, and at the rate of $2 per day from July 1, 1910, to' and including April 10,. 1916, 2,111 days, amounting to $4,222, in all the sum of $4,298. By an amended petition filed July 2, 1919, he demanded additional compensation at the rate of $1 per day for 3,363 days from April 16,1910, to June 30,1919, amount-ine to $3,363. By a second amended and supplemented petition filed November 12, 1920, upon which the case is submitted, the demand is for $3,465, at $1 per diem for the period from April 16, 1910, to and including October 10, *111 1919. During all of said period be bad been paid at the rate -of $4 per diem, and now contends that he was entitled to have been paid at the rate of $5 per diem. On October 9, 1919, he was promoted to inspector of customs at $5 per diem, and has since been paid at that rate.
The importance of this case is not measured alone by the amount immlved so far as this particular plaintiff is concerned, for it is apparent from the record that quite a large number of other cases may depend upon the conclusions reached here, and we may therefore, in this fact, find justification for a somewhat extended discussion.
Consideration of the case must necessarily involve a review of a number of statutes and some other matters with reference to the organization and conduct of the customs service and this may perhaps best be done before going to questions of construction and application. The review will be made as brief as possible.
By the act of July 31, 1789, 1 Stat. 45, and the act of March 3, 1797, 1 Stat. 503, the compensation of inspectors was fixed, respectively, at sums not exceeding $1.25 and $2 per day. By the act of March 2, 1799, 1 Stat'. 704, fixing the compensation of customs officers the compensation of inspectors was fixed at “ a sum not exceeding two dollars ” per diem, and by the act of April 26, 1816, 3 Stat. 306, there was allowed “ an addition of 50 per cent upon the sum allowed ” by the last preceding act.
The act of April 29, 1864, 13 Stat. 61, authorized the Secretary of the Treasury to increase the compensation of inspectors “in such ports as he may think it advisable so to do, and may designate, by adding to the present compensation of said officers, a sum not exceeding one dollar per ■day,” the increase not to extend beyond July 1, 1865. The act of March 2, 1865, 13 Stat. 460, extended the provisions of this act to July 1, 1866, and the act of July 23, 1866, 14 Stat. 208, continued it without limitation. Following these •acts section 2733 of the Revised Statutes provided that each inspector should receive for each day actually employed $3 and section 2737 authorized the Secretary of the Treasury to increase the compensation of inspectors by a sum not ex *112 ceeding $1 per day in such ports as he might think it advisable and may designate.
By the act of March 3, 1881, 21 Stat. 429, it was provided that hereafter the Secretary of the Treasury may appoint inspectors of customs at a compensation less than $3 per day when in his judgment the public service would permit.
By the act of December 16, 1902, 32 Stat. 753, the Secretary of the Treasury was authorized to increase the compensation of inspectors of customs at the port of New York as he might think advisable and proper by adding to their then compensation a sum not exceeding $1 per day, such additional compensation to be for work performed at unusual hours for which no compensation was then allowed and as reimbursement of expenses for meals and transportation while in the performance of official duties.
The deficiency act of June 30, 1906, 34 Stat. 636, appropriated $31,000 or so much thereof as 'might be necessary to pay inspectors of customs of the port of New York “ the difference between the per diem salary of $4 paid them during the months of October, November, and December, 1905, and their proper per diem salary for the same period ($5 per diem) in accordance with the act of Congress, approved December 16, 1902,” and by the act of March 4, 1907, 34 Stat. 1373, $940 was appropriated to enable the Secretary of the Treasury “to pay certain inspectors of customs of the port of New York the difference between the per diem salary of $4 paid them during the months of October, November, and December, 1905 and their proper per diem salary of $5 for the same period.”
By the act of March 4, 1909, 35 Stat. 1065, the Secretary of. the Treasury was authorized “ to increase and fix the compensation of inspectors of customs as he might think advisable, not to exceed in any case the rate of $6 per diem and in all cases where the maximum compensation is paid no allowance shall be made for meals and other expenses incurred by inspectors when required to work at unusual hours.”
■The act of August 24, 1912, 37 Stat. 434, directed the President to effect a reorganization of the customs service *113 and report the same to Congress, the come effective for the fiscal year 1914 beginning July .1, 1913, and to remain in force until otherwise provided by Congress. The reorganization thus directed was reported to Congress on March 3,1913, and may be found in Volume VI, Compiled Statutes of 1916, beginning at page 6513.
Since the chief reliance of plaintiff’s counsel seems to be upon the Cochnower case, 248 U. S., 405, and 249 U. S., 588, it is well to determine in the first instance whether the facts in the two cases are in effect the same or whether any material difference appears. Cochnower, having theretofore served in various capacities and at various salaries and then being “ Storekeeper No. 13, class 2,” was on June 16, 1908, effective from date of new oath, appointed “ as inspector No. 228, class 4, with compensation at the rate of $5 per diem,” in which position and at which rate he served until July 1, 1910, when, by virtue of an order appointing him as inspector, class 2, $4 per diem, his compensation was reduced to that amount. It is said in the opinion that the plaintiff’s petition showed that he was appointed on June 13, 1908, an inspector at $5 per diem and served at that rate until July 1, 1910, “ when he was reduced to $4 per diem,” and the case is treated as one involving simply a reduction of salary and it is turned largely upon the construction of section 2 of the act of March 4, 1909, particularly upon the construction of the words “increase and fix” used therein. It was, of course, not questioned that the statute authorized the Secretary of the Treasury within the stated limits to “ increase ” the compensation of inspectors and that it also authorized him to “ fix ” such compensation. But it was held contrary to the construction of this court that the language did not authorize a reduction in compensation. Cochnower had been appointed before the passage of the act of March 4, 1909, at a time when all inspectors of customs were being paid $5 per day and the action of the Secretary of the Treasury as complained of served to work a reduction in his compensation. The plaintiff in this case was appointed subsequent to the passage of that act. He was specifically appointed as inspector, class 2, new office, at $4 per day and has suffered no reduction from that salary.
*114 The stated, difference between the two cases seems to us a material one, and while referring to the Cochnower case there are other features which it may be as well to mention here. The claim as presented in the Cochnower case was for $2 per day, the difference between the reduced pay of $4 per day and a claimed pay of $6 per day. The judgment directed by the Supreme Court was for $1 per day, the difference between the reduced pay of $4 per day and a determined legal pay of $5 per day, the additional $f per day being rejected. It is also to be observed that the judgment directed was for the period from July 1, 1910, the date of the reduction, to June 30, 1913, inclusive, the last day before the taking effect of the reorganization of the customs service by the President as directed by the act of August 24, 1912. While it was held in the Cochnower case that the Secretary of the Treasury had no right to reduce Cochnower’s compensation from $5 to $4 per day, the holding was apparently upon the theory that the statutory compensation of an inspector was $5 per day, which the Secretary had no right to reduce.
There is to our minds another feature of that case which, if presented to the Supreme Court, a fact as to which we are not informed, was evidently not presented as it occurs to us, and upon that theory is not discussed. We do not mention it here because of any disposition to take issue with anything said in the Cochnower case, but because of its bearing upon the instant case and perhaps more strongly than upon the Cochnower case.
It appears from the findings in this case that from April 16, 1910, subsequent to the passage of the act of 1909, to June 30, 1910, 25 inspectors of customs, of which this plaintiff was one, were appointed at the port of New York, inspectors, class 2, new offices, at a compensation of $4 per diem, and that upon July 1, 1910, there became effective a reorganization of the customs service under which inspectors were classified in three classes at, respectively, $4, $5, and $6 per diem, 74 being assigned to the $4 class, 296 to the $5 class, and 52 to the $6 class, and that the assignments to such classes were the result of a grading and classification and not because of any extra service performed or any *115 work required outside of usual hours. The details of this reorganization are more fully set out in the findings. The Secretary of the Treasury and the collector of customs had construed the act of March 4, 1909, as authorizing a classification of the service, and upon July 1,1910, when it is said that Cochnower’s salary was reduced from $5 to $4 per day, this classification was in effect. The change in Cochnower’s salary from $5 to $4 per day is treated as a reduction of statutory salary and upon that basis may be conceded to have been unauthorized. In referring briefly to this feature of the situation it is said in the opinion of the court in the Cochnower case that—
“ It is, however, urged that the act implies minimum and maximum salaries especially of inspectors and also the power of classification of inspectors. We are not called upon to dispute it. The effect or the power does not enlarge the authority to increase salaries into an authority to decrease them. The power given can otherwise be accommodated.”
It seems to us that the change in Cochnower’s salary from $5 to $4 per diem is not under the circumstances to be regarded as a decrease in a statutory salary but rather a demotion in a classified service. If there was authority under that act to classify the inspectors at the port of New York and create classes, respectively, at $4,. $5, and $6 per day, there must have been in the appointing power authority to demote from $5 to the $4 class, and if there was a demotion in a classified service it was not a reduction in a statutory salary. This leads necessarily to the. question of whether under the act of March 4, 1909, a classification was authorized.
As bearing upon this question there is first for consideration the construction put upon the act by the Secretary of the Treasury,. whose duty it was to. administer it. He construed the act as permissive and as authorizing a classification of inspectors, not a new theory but in line with that prevailing under former acts, although somewhat differently applied. There is next for consideration the conclusion which it seems to us must be drawn from the action of the Supreme Court in the Cochnower case taken in con *116 nection with the demands of the plaintiff. The plaintiff did not sue alone to recover the difference between the salary paid him after July 1, 1910, and the salary he was theretofore receiving, but he sought to recover the difference between the salary paid him after July 1, 1910, and the maximum of $6 per diem authorized by this act, upon the theory clearly that the act fixed the statutory compensation of inspectors at $6 per diem. This contention was not sustained by the Supreme Court, and since it is clearly apparent from the act itself that it authorized a maximum salary of $6 per diem it must be concluded that the act was by the Supreme Court regarded as permissive in its character. Indeed, the language of the act itself clearly indicates that a graduation in salaries was contemplated, for under its language there must necessarily follow a difference in compensation unless the service of all inspectors was the same and all were to receive the maximum salary. But the act authorized the Secretary of the Treasury to act “ as he might think advisable ” and clearly contemplated that allowances might be paid to inspectors receiving less than the maximum salary which could not be paid to those receiving such maximum.. It would seem that if this act is to be regarded as mandatory the conclusion must have been reached, as claimed by Cochnower, that when the Secretary fixed the salary of some inspectors at $6 per diem that became the statutory salary under the act and he would have been permitted to recover $2 per diem instead of the $1 awarded.
But to determine the situation as it existed on the 1st of July, Í910, when Cochnower was demoted, and as it existed when this plaintiff was appointed in April, 1910, and as it existed when Cochnower was appointed at a salary of $5 per diem, it is necessary to consider also the act of 1902. If the act of 1909 was permissive in its character it would seem that the act of 1902 must also be so construed. The language of the two acts in their essence is strikingly similar. By the act of 1902 the Secretary of the Treasury was clearly not directed to increase the compensation of inspectors, but he was “ authorized ” to increase the compensation “ as he may think advisable and proper ” by adding $1 *117 per day, etc. The salary being paid inspectors of customs at the time of the passage of this act was $4 per diem. It does violence to the language of the act clearly importing a discretion to say that it increased the compensation of all inspectors to $5 per diem and fixed that compensation as a statutory compensation. And this statement involves no issue between us and the holding in the Cochnower case, for it is not necessary in order to sustain the holding in that case to conclude.that the act of 1902 by its terms fixed the salary of inspectors at $5 per diem. The situation is sufficiently met under the theory of that case when it is said that the act being permissive in its character authorized the Secretary of the Treasury in his discretion to increase salaries of inspectors to $5 per diem, and when he had, as in the Cochnower case, exercised that discretion, Cochnower’s salary then became fixed at $5 per diem by virtue not alone of the statute but by virtue of the exercise by the Secretary of the Treasury of the authority conferred upon him by the statute.
But let us consider these statutes and their operation a little further. The contention in the Cochnower case that this act of 1909 fixed the salary of inspectors at $6 per diem was, as we have seen, not sustained by the Supreme Court and that theory upon which the original petition in this case was based has been abandoned. The theory now is in the instant case that by the act of 1902 the salary of inspectors was fixed at $5 per day, and therefore this plaintiff, when appointed at $4 per day, was entitled to $5 per day. It would seem that the same process of reasoning, in the light of the decision of the Supreme Court, which would prompt the abandonment of the claim of this plaintiff for $2 additional per day on and after July 1, 1910, must prompt the abandonment of claim for any compensation other than that paid. By the plan of reorganization under the act of 1909 provision was made for inspectors of different classes with relative salaries of $4, $5, and $6 per day. The statute fixed a maximum of $6 per day, but that it did not fix a statutory salary of $6 per day for all inspectors is decided. And it is so decided notwithstanding the fact that the salary of some inspectors was fixed at $6 per day. *118 The conclusion as to the The right existed under that act to appoint inspectors at $5 per day. And if the right to thus classify inspectors and grade salaries accordingly existed, it is difficult to find any basis for the conclusion that there was not also authority to provide for another class at $4 per day.
To sustain the theory that this might not therefore to sustain the plaintiff’s claim, it is necessary to revert to the preceding act of 1902; conclude that that act fixed the salary of inspectors at $5 per day; that all inspectors were entitled to receive that salary, and that the act of 1909 conferred no power to reduce, by classification or otherwise, the salary thus fixed.
But if the act of 1909 did not $6 per day, much less, apparently, did the act of 1902 fix them at $5 per day. Before referring to its phraseology let us revert to conditions existing at the time of its passage. Before its passage inspectors were receiving $4 per day, and after its passage inspectors then in the service and then inspectors, class 2, with compensation at $4 per day, were appointed “inspectors of customs, class 4, new offices, with compensation at the rate of five dollars ($5) per diem each.” It is assumed that when this act was passed the statutory salary of an inspector was $4 per day. But, although they were then being paid that salary, the law clearly did not so require.
When the statutes were revised lished in the second edition, known as the Devised Statutes, 1878, section 2733 was made to say that inspectors of customs should receive $3 per day, and section 2737 authorized an increase of $1 per day in such ports as the Secretary might think advisable and designate. Section 2733, we venture to say, did not reflect the law as it then existed, which it was no doubt intended should be the case, but it was so enacted. It may be observed here that this is the first declaration fixing a salary for inspectors instead of fixing a maximum. But there followed the act of March 3, 1881, 21 Stat., 429, overlooked in some discussions of the matter, providing that the Secretary of the Treasury may appoint inspectors of customs at a compensation less than $3 per day *119 (italics ours) when in his judgment the public service would permit.
Following so soon after the revision of 1878, it may reasonably be assumed that the very purpose of this legislation was to get away from the idea of a fixed salary as provided in section 2733, and resort to the practice prevailing from the beginning of fixing a maximum and leaving its application to the Secretary of the Treasury.
We think therefore it may be confidently asserted that when the act of 1902 was passed there was hot a fixed statutory salary of $4 per diem for inspectors, even though under statutory authority they were being paid that sum. Add to this situation a consideration of the language used in that act, and any foundation for the contention that it fixed a statutory salary of $5 per day seems to vanish into thin air. The act itself authorized an increase of $1 per day in the compensation of inspectors at the port of New York as the Secretary of the Treasury “ may think advisable and proper,” thus clearly conferring a discretion; and more, it provided it should be as compensation for services of a character which it may be assumed might or might not be performed alike by all employees of that class.
If, then, the statute itself did not fix a specific salary the only remaining basis, apparently, for the contention that there was a fixed salary, must be found in the fact that the Secretary, under the authority of that act, did appoint many, and for ought we know, all of the inspectors, then class 2 at $4 per diem, “ inspectors, class 4, $5 per diem.” If in fact he saw fit to then exercise his discretion for the benefit of all the inspectors he certainly was not thereby deprived of his discretion, if he had seen fit so to exercise it, to retain all or any part of them in class 2 at $4 per diem and deny them increases if he did not think it “ advisable and proper.” And if his statutory discretion remained, how can it be said that he could not, as in the case of the plaintiff herein, appoint him an inspector, class 2, at $4 per diem? But again, and for application here, we must not forget that the act of 1881 specifically authorized the appointment of inspectors, not at $4 or $3 per diem but at less than $3. And the purpose of that act, we think, was to remove a statutory bar to *120 the exercise of a discretion which, had existed for the better part of a century.
It is contended that the two statutes, or more properly speaking, provisions in deficiency appropriation acts which appropriated money to pay certain inspectors the difference between $4 per diem, which they had received for a certain period of three months, and a statutory salary of $5 per diem, amounted to a legislative interpretation of the' act of 1902 to the effect that that act fixed a statutory salary at $5 per diem for inspectors of customs.
It is not necessary to reach any such conclusions because of the action had by Congress in these matters. The' act of 1902, which scarcely seemed to be a fit subject for legislative interpretation, was not at all ambiguous in its terms. If not. ambiguous there was no cause for the application of any rules of construction and no basis for resort to legislative interpretation. In fact, if there is any ambiguity in the situation the ambiguity arises by reason of the declarations of Congress in the deficiency acts referred to. If Congress desired to provide that the salaries of all inspectors of customs should be $5 per day it had power to do it in a proper way. It probably had no such intention.
Aside from the discretionary feature of the act of 1902, already discussed, that act provided that such additional compensation should be for certain extra services performed at unusual hours, etc., and for certain expenses, and to conclude that Congress meant to interpret that act as providing a fixed salary for all inspectors requires a conclusion that Congress not only disregarded the discretion conferred by the act, but determined also that all inspectors were in the discharge of the extra duties for which the additional compensation was to be allowed.
By one of the deficiency acts referred to Congress did appropriate money to pay inspectors at New York the difference between the $4 per day they had received during the months of October, November, and December, 1905, and “ the proper per diem salary for the same period ($5 per diem), in accordance with the act of Congress approved December 16, 1902.” And by the other act similar provision was made in small amount to pay “ certain ” other inspectors.
*121 The period involved was that between the order of October 2,1905, and the order of January 8,1906, referred to in Finding Y. The first order evidently contemplated a return by reduction in classification to a basic pay of $4 per day and the payment of $1 additional for each day when services were performed at unusual hours and the second order restored the condition existing before the first. Just what the situation to be met by the deficiency appropriation was, is not clearly shown, and we are not informed whether payment was to be made to all inspectors or in the same amounts or upon a basis of equalization. '
We think an examination of certain decisions of the Comptroller of the Treasury furnishes the reasons why these changes were made and shows that they were made in an attempt to meet administrative difficulties, and were justified, but we do not attach enough importance to the matter to justify going into the reasons in detail. The meat of the contention, so far as there is any, is found in the language of the deficiency act referring to $5 per day as the “ proper per diem salary.”
From some standpoint not shown the Secretary evidently concluded that he ought to adjust pay for this period on a $5 per diem basis. As shown by official records, he feared that if he made these payments from the current appropriation he would create a deficiency therein, and he thought it better to ask a deficiency appropriation for the purpose. If outside of the record, it does not do violence to our general, if not judicial, knowledge of such matters to assume that a provision in a deficiency bill appropriating a considerable sum of money to be paid to certain employees would not have gotten very far if upon its face it might not controvert the idea of gratuity. Some reason must be given. Of what importance was phraseology when money was wanted ? But further discussion is not justified. We can not conclude that .a plain, unambiguous act can be thus changed in its whole import by an assumed legislative construction for which there is no foundation.
Aside from the application of the pertinent parts of what has been said there are for consideration some facts peculiar to the instant case. Ryan was appointed inspector on April *122 16, 1910, and therefore at a time when the act 4, 1909, was the last legislation bearing upon salaries of inspectors. He, with others, was appointed “inspector, class 2, new office, with compensation at the rate of $4 per diem, e'ach, to take effect from date of new path.” His oath taken April 16, 1910, recited that he had been appointed “inspector, class 2.” The appointment recited that the position to which he was appointed was a new office. It is not to be inferred from this recital that the collector’s office in New York had never before had a classified position as inspector, class 2. For many years theretofore, and in fact, continually since the civil-service law became operative, inspectors at the port of New York had been designated by classes. The explanation of the designation of these offices to which Ryan and others were then appointed as “new offices ” is found in the fact, as shown in the findings, that in January, 1906, for the purpose of restoring these officers to the grades occupied by them before October, 1905, the inspectors then in office and then designated as inspectors,' class 2, at a salary of $4 per diem, had been appointed inspectors, class 4, at a salary of $5 per diem' and by the order thus appointing them, their positions as inspectors, class 2, thus vacated, were abolished. It had been the practice whenever all employees in any one class were appointed to another class to order the positions vacated to be abolished. Apparent vacancies were thus avoided.
At and before the time of Ryan’s appointment a committee appointed by the collector at the port of New York was at work on a plan of reorganization which was finally recommended by Collector Loeb to and approved by the Secretary of the Treasury and which as to the whole office became effective July 1, 1910. This plan of reorganization contemplated a classification of the inspectors at $4, $5, and $6 per diem and, although, as to the whole office the reorganization was not effective until July 1, 1910, the beginning of a new fiscal year, these new appointments made in April theretofore and other new appointments made between that time and July 1, 1910, were made in anticipation of this classification, as inspectors, class 2, salary $4 per diem. Ryan therefore from the date of his appoint *123 ment received the proper salary of the office and grade to which he was appointed, and it was never during the period here involved reduced.
The position of inspector of customs at the port of New York had been within the provisions of the civil service act and the regulations thereunder from the time that said act first became operative. A board of examiners for the customs service at the port of New York had been created by the Civil Service Commission and regulations promulgated governing the examinations for appointment and for promotions in that service. Under the civil service law a classified employee in class 2 was entitled to receive a salary of $1,400 per year and not more than $1,600. Salaries of inspectors at the port of New York were and always had been upon a per diem and not upon an annual basis. Under the rules, therefore, of the Civil Service Commission a per diem employee whose compensation was fixed at a given rate per diem fell automatically into the class indicated by his compensation, and a per diem employee receiving $4 per diem or $1,460 per annum, figured upon the basis of $4 per diem for each day of the year, fell automatically into class 2, and reversing the reasoning, if by virtue of his examination he was eligible to a class 2 appointment his salary must be fixed upon the basis authorized for that grade — that is, $1,400 and not more than $1,600. After first appointment as inspector he might be promoted to a higher class without reexamination. Previous to his promotion, examination, and appointment as inspector, Byan had, on January 29, 1909, been promoted to and appointed a clerk, class 1, salary $1,200, as a result of a first-grade promotion examination. His appointment on April 16, 1910, as an inspector at $4 per diem was the result of a promotion examination which served to place him in class 2. His eligibility then was to a class 2 appointment. A class 2 appointee must receive at the maximum a salary less than $1,600 per annum. The highest salary on a per diem basis to which Byan was then eligible was $4.38 per diem, or $4 stated in even dollars. The conclusion, therefore, seems to be forced that he was not then eligible to an appointment to a position the salary of which was $5' per diem. Inspectors receiving salaries of $5 per diem were and at all *124 times during the operation of the civil service law had been rated as inspectors, class 4. Byan was never appointed an inspector, class 4, until October 9, 1919, and never theretofore held that office. To hold that from the time of his appointment in April, 1910, he was entitled to receive $5 per diem compensation is to hold that he was then appointed an inspector, class 4, to which he was ineligible, and if he had been so appointed his appointment under the civil service act would have been invalid.
There is one other feature of this case for consideration. If the theory of the plaintiff is correct and he,in fact was entitled to receive compensation at the rate of $5 per diem from the date of his appointment we are of the opinion that it was incumbent upon him to assert his claim within at least a reasonable time thereafter. This suit has been long pending in this court for reasons not necessary to state until now the plaintiff is in the attitude of asserting a claim which, at $1 per diem, amounts to $3,465. But eliminating the additions to the claim made by two amended and supplemental petitions the fact is that when he first asserted his ■claim the statutory period of limitations was within three days of expiration and he was then for the first time, so far as appears, asserting a claim which had been permitted to accrue from April 16,1910, to April 10, 1916, a period of six years less six days. In his original petition he had asserted a claim for $1 per day from the date of his appointment to and including the 30th of June of that year and at $2 per day from that date on to and including April 10, 1916. During all of this period he had received the compensation which we are justified in assuming he had expected to receive and all that he expected to receive when he was appointed, and having been paid each month as inspectors are regularly paid he had, so far as appears, at no time asserted any right to compensation other than that received by him. The Supreme Court has declared itself very emphatically with reference to the effect of such conduct on the part of a Government employee. There are so many manifest reasons why a Government employee should not be permitted for a long period of time to receive without protest the compensation which it may be assumed that he and his appointing *125 officer both deemed him entitled to receive and afterwards assert a claim for a large amount of accrued compensation, that it is not deemed necessary to discuss them here. We refer to the case of United States v. Garlinger, 169 U. S. 316 at 322 and cases cited.
It is not necessary to invoke all the propositions stated to justify a conclusion against the right of the plaintiff to recover, but upon them all there would seem to be no possible room for any other conclusion. We are of the opinion that the plaintiff is not entitled to recover, that his petition must be dismissed, and we have so ordered.
Graham, Judge; Hay, Judge; Booth, Judge, and Campbell, Chief Justice, concur.